UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

EDWARD A. MCGILL,                          )
                                           )
                    Plaintiff,             )
                                           )
            vs.                            )        No. 1:14-cv-00399-SEB-MJD
                                           )
CAROLYN W. COLVIN Acting                   )
Commissioner of the Social Security        )
Administration,                            )
                                           )
                    Defendant.             )

## REPORT AND RECOMMENDATION

Plaintiff Edward McGill requests judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his applications

for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C.

§§ 416(i), 423(d), & 1382c(a)(3). For the reasons set forth below, the Magistrate Judge

recommends that the decision of the Commissioner be **REVERSED** and **REMANDED**.

### Procedural History

McGill filed an application for DIB and SSI on February 2, 2011, alleging an onset of

disability on March 28, 2010. McGill's application was denied initially on August 3, 2011 and

on reconsideration on November 9, 2011. McGill requested a hearing, which occurred before

Administrative Law Judge ("ALJ") Thomas Wang on October 17, 2012. The ALJ concluded

Plaintiff was not disabled at any time from his alleged onset date through the date of the ALJ's

October 30, 2012 decision. The Appeals Council denied McGill's request for review on January

31, 2014, rendering the ALJ's decision final. McGill filed his Complaint with this Court on March 3, 2014.

## Factual Background and Medical History

Plaintiff Edward McGill was 50 years old at the time of the alleged onset of disability. [R. at 25.] He suffered from degenerative disc disease; lateral epicondylitis of the right elbow; migraine headaches; left hip pain; back and flank pain associated with a spleen hematoma; conjunctivitis; congestive heart failure; depression; anxiety; and anger problems. [R. at 11-15.]

### A. Physical Problems and Symptoms

The alleged onset of disability coincided with an injury to Plaintiff's elbow. [*See* R. at 277.] Plaintiff described being "attacked by a coworker who threw him backwards, causing him to land on his right elbow." [R. at 295-96.] He experienced moderate pain, moderate swelling, and tingling. [*Id.*] An X-ray revealed an avulsion fracture of the lateral epicondyle. [R. at 278-79.] Dr. John Garber treated Plaintiff with pain medication, ice, and elevation of the affected area, [*id.*], as well as a posterior splint and sling. [R. at 296.] A neurological exam was normal, but Dr. Garber restricted Plaintiff from working until after a follow-up appointment. [R. at 297.] He also noted that Plaintiff had a history of other problems, including anxiety, chest pain, and headaches. [R. at 298.]

Two weeks later, Dr. Garber examined Plaintiff and stated that he had "improved," but gave him a "work status excuse from work for three weeks." [R. at 299.] Plaintiff returned to Dr. Garber on May 4, 2010. [R. at 302.] He continued to report pain, and Dr. Garber was concerned that Plaintiff's "pain persists and is not improving with time." [*Id.*] Dr. Garber recommended an MRI and wrote that Plaintiff "is released from work until further notice." [R. at 303.]

The MRI showed common extensor tendinopathy at the lateral epicondyle of Plaintiff's right elbow, but was "[o]therwise unremarkable." [R. at 305.] It was negative for fractures and revealed that Plaintiff's tendons and ligaments were intact. [R. at 304-05.] Plaintiff discussed the MRI results with Dr. Garber and noted that his pain had worsened. [R. at 306.] Dr. Garber recommended physical therapy; instructed Plaintiff to return in five weeks; and stated that Plaintiff could not return to work until that time. [*Id.*] Plaintiff's physical therapist noted that Plaintiff was "hypersensitive" to movement of the elbow, and that Plaintiff could only attend one physical therapy session per week because of "financial constraints." [R. at 321.]

Plaintiff returned to Dr. Garber on June 15, 2010 and reported that his elbow remained painful. [R. at 308.] An examination revealed reduced elbow extension and flexion, muscle weakness, and tenderness. [*Id.*] Dr. Garber again recommended physical therapy; instructed Plaintiff to return in one month; and wrote that Plaintiff could not yet return to work. [*Id.*]

Dr. Garber examined Plaintiff again on July 15, 2010. [R. at 310.] Plaintiff had undergone physical therapy for three weeks, and his extension, flexion, and muscle strength were normal. [R. at 310.] Dr. Garber noted "slow improvement," but Plaintiff continued to have pain, and he reported wearing a brace to ease his symptoms. [*Id.*] Dr. Garber suggested a steroid injection, but Plaintiff elected to wait another month before considering an injection. [*Id.*] Until that time, Dr. Garber advised Plaintiff to continue physical therapy and wrote that Plaintiff could not return to work. [*Id.*]

At his next appointment, Plaintiff continued to report elbow pain. [R. at 313.] Dr. Garber was unsure why Plaintiff's condition was not improving. [*Id.*] Plaintiff again deferred a steroid injection, and Dr. Garber restricted Plaintiff from working for another month. [*Id.*]

Plaintiff then saw Dr. Garber on September 14, 2010. [R. at 316.] He had continued with physical therapy, but his "pain and weakness [were] still very limiting." [*Id.*] His neurological exam remained normal, but he had reduced range of motion and muscle strength around the elbow. [*Id.*] Plaintiff agreed to have the steroid injection, and he "tolerated the procedure well and was stable afterwards." [*Id.*] A follow-up appointment on October 12, 2010 indicated that the injection provided "good relief of pain," but this "lasted for only 3 [weeks]." [R. at 317.] By the time of the follow-up, the pain was "very limiting" again, [*id.*], and Plaintiff agreed to have surgery. [R. at 318.] Dr. Garber also excused Plaintiff from work for another month. [R. at 322.]

The elbow surgery occurred in November 2010. [R. at 319.] A follow-up with Dr. Garber revealed good progress, including a full range of motion and "good strength." [R. at 320.] A December 2010 appointment indicated additional improvement, but Plaintiff continued to report pain and Dr. Garber again excused him from work. [R. at 323.] In January 2010, Plaintiff said the surgery "had helped but not cured the pain." [R. at 328.] At that appointment, Dr. Garber also noted that Plaintiff had developed "a cyst on his spleen," which prevented Plaintiff from attending physical therapy sessions. [*Id.*] Dr. Garber prescribed pain medication, kept Plaintiff off of work, and instructed him to return in six weeks. [*Id.*]

In March 2011, Dr. Garber reported that Plaintiff's right elbow had "reached a plateau in its improvement." [R. at 330.] By that time, Plaintiff had full range of motion and normal muscle strength, but still had pain in the elbow, and Dr. Garber permanently restricted Plaintiff from lifting or carrying more than 20 pounds. [R. at 330-31.] He also wrote that Plaintiff likely would never be able to return to work as a mechanic. [R. at 331.]

After the altercation that produced the elbow injury, Plaintiff also suffered abdominal pain. [R. at 338.] This pain grew worse in December 2010, prompting Plaintiff to seek treatment

from a clinic at Wishard Memorial Hospital. [*Id.*] Doctors determined that Plaintiff had "a very large splenic cyst," [*id.*], but CT scans in February and May of 2011 showed that the cyst had decreased in size. [R. at 480.] Dr. Garber noted that the cyst had "apparently reabsorbed," and Plaintiff "did not require surgery for it." [R. at 330.]

Plaintiff also suffers from headaches, which began after he underwent facial reconstruction surgery several years before applying for disability benefits. [R. at 353.] In January 2010, he saw Dr. Raquel Villavicencio at the emergency department at Wishard Memorial Hospital. She described Plaintiff's condition as a combination of migraines and tension headaches. [R. at 355.] In February 2010, Dr. Villavicencio reported that Plaintiff's headaches had become more severe and that he had "extreme severe headaches approximately one time a week," which could last "as long as three days." [R. at 353.] With medication, however, Plaintiff was "able to manage to go to work." [*Id.*]

Dr. Villavicencio ordered an MRI of Plaintiff's head, but the results were normal. [R. at 352.] Plaintiff saw Dr. Villavicencio again in June and July of 2010, but at the July appointment, he was "extremely upset/agitated" and used "profuse profanities."[1] [R. at 350.] He returned to Wishard in August 2010, and reported both mild headaches every day and "more severe disabling headaches two to three times a week." [R. at 348.] He also reported loss of consciousness and blackouts. [*Id.*] The staff doctor recommended a sleep-deprived EEG to help determine whether Plaintiff could be suffering from seizures. [R. at 349.] Plaintiff reported that Fioricet and propranol had not helped his condition, and the doctor started him on amitriptyline. [R. at 348-49.]

---

[1] Plaintiff's anger issues and mental impairments are discussed more fully below.

In November 2010, Plaintiff returned to Wishard and reported that Triptan helped relieve his headaches, but also reported to Dr. Karen Roos that he was experiencing "decreased balance" and had "two additional episodes of almost passing out." [R. at 347.] Dr. Roos increased his Triptan dosage and instructed him to follow up in three months. [*Id.*] Plaintiff did so in February 2011, but reported to Dr. Jay Bhatt that he still suffered multiple severe headaches every week. [R. at 336.] Dr. Bhatt started Plaintiff on Topamax and instructed him to follow up again in three months. [*Id.*] He also noted that Plaintiff likely would never be "headache free." [*Id.*]

In April 2011, Plaintiff returned to Wishard and again complained of migraine headaches. [R. at 479.] He said that the pain had been better for a time, but that it had grown "acutely worse" in the days prior to his visit. [*Id.*] He returned again in July 2011 and reported that "maybe the intensity of [the headaches] is getting better." [R. at 442.] He also mentioned that Imitrex "does help his headaches." [R. at 443.] Dr. Roos increased Plaintiff's Topamax dosage and refilled his Imitrex prescription, but noted that Plaintiff would need to decrease his blood pressure before frequently using the Imitrex. [*Id.*]

In August 2011, state agency reviewing doctor Joseph Gaddy considered the medical record and determined Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand and/or walk for a total of about 6 hours per day. [R. at 460.] Dr. Gaddy specifically noted Plaintiff's history of headaches and lateral epicondylitis in his elbow. [*Id.*] Dr. B. Whitley affirmed Dr. Gaddy's opinion in November 2011. [R. at 477.]

The next month, Plaintiff saw Dr. Villavicencio with complaints of left hip pain after a garage door fell on him. [R. at 485.] Dr. Villavicencio ordered MRIs of Plaintiff's spine, pelvis, and hips. [*Id.*] They showed "mild to moderate degenerative disc disease" due to "normal aging" in the spine and "unremarkable" results in the pelvis and hips. [R. at 486-87.] Plaintiff

nonetheless complained that he was in so much pain that he could barely walk. [R. at 487.] Dr. Villavicencio recommended physical therapy, [R. at 488], and referred Plaintiff to a pain clinic. [R. at 489.] Plaintiff did not attend the recommended therapy sessions. [*Id.*] An MRI in February 2012 again showed degenerative disc disease, as well as a bulging disc at T6-T7. [R. at 492.] Dr. Villavicencio again recommended physical therapy and continued Plaintiff on pain medication. [*Id.*] She also referred Plaintiff to a neurologist for treatment of the bulging disc. [*Id.*]

From July through September of 2012, Plaintiff underwent physical therapy. [R. at 500-25.] He reported continued pain and stated that the therapy did not provide significant relief. [R. at 504, 510, 513-14.] He also continued to have headaches "all day every day." [R. at 512.]

In September 2012, Plaintiff saw Dr. Brett Huffman and Dr. Marcia Diaz. Dr. Huffman reviewed Plaintiff's neurological records, noted a history of disc bulges and radiculopathy, and referred Plaintiff for selective nerve root injections to try to reduce his pain. [R. at 526.] Dr. Diaz wrote that Plaintiff should not "stay in the same position for long periods of time at work and home, to help with his recovery and due to his back problems." [R. at 494.]

At the October 2012 hearing before the ALJ, Plaintiff testified that he continued to have pain in his back and left hip, and that the spinal injection Dr. Huffman recommended had been effective for "three or four days." [R. at 41-42.] Afterward, however, the pain returned and was "excruciating." [*Id.*] Plaintiff described his headaches as occurring "at least once a week, sometimes twice, sometimes three times," and said they were "pretty severe." [R. at 46.] He also stated that he could not sit comfortably for longer than 30 minutes at a time, and said that his doctor had permanently restricted him from lifting more than five pounds. [R. at 46-47.]

## B. Mental Problems and Symptoms

Plaintiff's records contain evidence of various mental problems. In January 2010, he received treatment at the Midtown Community Mental Health Center. [R. at 416-418.] He had a history of panic disorder and depression, but his symptoms were "adequately managed" with medication and he could "get through panic attacks using coping skills." [R. at 416.] His care provider also noted that Plaintiff's former wife had a protective order against him because of threats he had made against her. [*Id.*]

The Midtown center referred Plaintiff to a primary care clinic, where therapist Robert Stuckey evaluated him in April 2010. [R. at 287.] Plaintiff had a history of "verbal and physical altercations including inflicting severe beatings on others," but Plaintiff stated that medications such as Seroquel and Klonopin reduced his belligerence. [*Id.*] He also reported that the March 2010 accident in which he had injured his elbow was the result of "being attacked by [a] fellow employee," and that his co-workers alleged that he "provoked" the assailant. [*Id.*]

The therapist wrote that Plaintiff had panic attacks, irritability, anger, and "difficulty checking impulses to strike out." [*Id.*] He diagnosed "Intermittent Explosive Disorder," "Anxiety," and "Panic Disorder," and referred Plaintiff to an anger management group at the Midtown Westside Clinic. [*Id.*] Plaintiff, however, reported in June 2010 that he did not attend the group sessions because "he didn't have the money for it." [R. at 288.] He also complained that behavioral therapy did not improve his panic attacks and asked for medication to control his condition. [*Id.*]

In August 2010, Plaintiff returned to the Midtown Community Mental Health Center because he "had a verbal altercation" with the staff at the primary care clinic. [R. at 408.] Plaintiff was transferred to a "medication only" clinic, where he hoped "to get medications

renewed to treat anxiety and sleeplessness." [*Id.*] He reported agitation, anxiety, racing thoughts, difficulty concentrating, and a history of being in a "rage." [*Id.*] He also said he stayed home to "avoid stress" and "altercations with others." [*Id.* at 408.] The clinic renewed Plaintiff's medications to "treat symptoms of panic and depression." [*Id.*]

Plaintiff returned to the medication only clinic to have his prescriptions renewed in November 2010. [R. at 409.] He reported that he was "on edge all day long," and would walk his dog "50 times a day to get out of the house." [*Id.*] He had a sense of "wanting to almost get into a fight . . . just to let all this energy out." [*Id.*] Not being able to work left him "depressed," and he complained of "family conflicts, especially with his brother." [*Id.*]

In February 2011, the medication only clinic started Plaintiff on Geodon and Remeron after he stated that his previous medications had stopped controlling his symptoms. [R. at 411.] He complained of racing thoughts, decreased concentration, and "agitation/anger," which were aggravated by "external stressors," such as his "daughter and grandson taking off." [*Id.*] The next month, Plaintiff again reported that he was irritable and "always agitated." [R. at 412.] The clinic continued his medications. [*Id.*]

On April 11, 2011, Dr. Wayne Hoye completed a consultative examination. [R. at 383.] Plaintiff's affect was appropriate and he was generally cooperative. [*Id.*] Dr. Hoye did not receive any records of psychiatric treatment, [*id.*], but noted that Plaintiff was on antidepressant medications and "endorsed a mild level of current depressive symptoms." [R. at 385-86.] Plaintiff explained that he did "not get out much at all," and reported little in the way of social activities "other than going to church." [R. at 386.] Dr. Hoye assigned a GAF score of 63, indicating mild symptoms or limitations in social functioning. [*Id.*; *see also* Dkt. 16 at 8.]

Plaintiff returned to the medication only clinic on April 19, 2011. [R. at 414.] He appeared irritable, and he described his mood as "frustrated" and "pretty bad." [*Id.*] The clinic continued Plaintiff on his medications. [*Id.*]

In May 2011, state agency reviewing psychologist Dr. Amy Johnson completed a Psychiatric Review Technique form. [R. at 419.] She determined Plaintiff's impairments were not severe and indicated Plaintiff had no limitations on activities of daily limitations; no difficulties in social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. [R.at 429.] She noted that Plaintiff was able to perform a variety of activities, such as cleaning, managing funds, socializing, and attending church. [R. at 431.] She also opined that Plaintiff "[g]ets along fine with others" and "[h]andles stress and change fine." [*Id.*] Dr. Joelle Larsen later affirmed Dr. Johnson's opinion. [R. at 476.]

In August 2011, Plaintiff returned to the medication only clinic. [R. at 471.] He reported that he "does get along with most family and does get along well with others," except that he "does not talk to his brother." [*Id.*] He was "socially connected with acquaintances," knew his neighbors, and "help[ed] with the children's bikes in his neighborhood." [*Id.*] He reported difficulties with impulse control and stated that his symptoms of depression had been escalating over the past month. [R. at 472.] He also believed that "others feel intimidated by him." [*Id.*] The clinic continued Plaintiff on his medications. [*Id.*]

At the October 2012 hearing before the ALJ, Plaintiff testified that he had no hobbies and was not involved in any organizations or volunteer work. [R. at 39.] Vocational expert Constance Brown also testified. [R. at 47.] In response to the ALJ's hypothetical questions, she stated that a person with Plaintiff's age, education, work experience, and residual functional capacity would be able to perform jobs such as arcade attendant, information clerk, and office helper. [R. at 54.]

**<u>Applicable Standard</u>**

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423.[2] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

---

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## The ALJ's Decision

The ALJ first determined McGill met the insured status requirements of the Social Security Act through December 31, 2015. [R. at 11.] Applying the five-step analysis, the ALJ found at step one that McGill had not engaged in substantial gainful activity since March 28, 2010, the alleged onset date. [*Id.*] At step two, the ALJ found McGill suffered from the following "severe" impairments: degenerative disc disease; lateral epicondylitis of the right elbow; and migraine headaches. [*Id.*] The ALJ also considered McGill's left hip pain [R. at 12]; spleen hematoma [R. at 12-13]; conjunctivitis [R. at 13]; congestive heart failure [*id.*]; and mental problems, including depression, anxiety, and anger problems. [R. at 14-16.] He concluded that these problems were not severe. [R. at 11-16.]

At step three, the ALJ concluded that McGill did not have an impairment or combination of impairments that meets or medically equals one of the entries in the Listing of Impairments. [R. at 16.] The ALJ specifically considered and rejected Listings 11.14 (peripheral neuropathies), 1.04 (disorders of the spine), and 11.03 (nonconvulsive epilepsy). [R. at 17.] After step three but before step four, the ALJ found that McGill had the residual functional capacity to do the full range of light work as described in the Social Security regulations, except that he had additional limitations that would:

> limit him to lifting no more than 5 pounds with the dominant right hand. He further would need to be allowed to sit or stand alternatively at will, provided that this would not place him off-task. He can occasionally balance, with use of a cane. He further can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs. He can never climb ladders, ropes, or scaffolds. He can occasionally reach (including overhead), and handle with the right upper limb. He would need to avoid concentrated exposure to use of moving machinery, and any exposure to working at unprotected heights. He further would need to be off task for 5 percent of the work day, in addition to regularly scheduled breaks.

[R. at 23.] At step four, the ALJ determined that McGill was unable to perform any of his past relevant work as a furniture salesperson, truck operator, yard manager, or mechanic. [R. at 25.] At step 5, the ALJ determined that a person of McGill's age, education, work experience, and residual functional capacity would be able to perform the requirements of jobs such as arcade attendant, office helper, and information clerk. [R. at 26.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded McGill was not disabled. [*Id.*]

### Discussion

Plaintiff first contends that the ALJ erred by not finding his mental impairments severe, or "at least in not considering the combine[d] effect of the non-severe impairment" in his RFC analysis. [Dkt. 15 at 14.] Plaintiff then argues that the ALJ's decision does not "adequately address McGill's migraines and headaches" under Listing 11.03. [*Id.* at 10.] Finally, Plaintiff

contends that the ALJ did not properly address his excusals from work due to right elbow problems. [*Id.* at 26.]

## A. Severe Impairments and RFC Analysis

Plaintiff argues that the ALJ 1) should have concluded that Plaintiff's mental impairments were severe [*id.* at 14-17]; and 2) should have given more weight to Plaintiff's non-severe impairments in formulating Plaintiff's RFC. [*Id.* at 17.]

### 1. Severity of Mental Impairments

Plaintiff contends that substantial evidence does not support the ALJ's conclusion that his mental impairments were not "severe." [Dkt. 15 at 14.] An impairment is "severe" if it "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).[3] An impairment is *not* severe "when medical evidence establishes only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability to work." SSR 85-28.

The ALJ in this case considered Plaintiff's "depression," "anxiety," and "anger problems," and concluded that they were not severe. [R. at 15.] In doing so, he employed the technique for evaluating mental impairments set out in 20 C.F.R § 404.1520a(c)(3) and considered the four functional areas described in paragraphs B and C in section 12.00 of the Listing of Impairments: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. [R. at 15-16.]

Plaintiff specifically targets the ALJ's assessment of his social functioning. [Dkt. 15 at 15-16.] In evaluating this area, the ALJ acknowledged that Plaintiff reported a history of verbal and physical altercations; that he expressed occasional urges to fight to release his energy; and

---

[3] Basic work activities include walking, standing, sitting, pushing, and handling; understanding, carrying out, and remembering instructions; and responding appropriately to supervision and co-workers. *Id.* § 404.1521(b).

that he had a verbal altercation with clinic staff members. [R. at 15] The ALJ, however, wrote that these reports were "substantially outweighed by other evidence," and noted 1) that medication reduced Plaintiff's belligerence; 2) that he got along well with most of his family members; 3) that he was socially connected and knew his neighbors; and 4) that he was able to sustain long-term romantic relationships. [R. at 15-16.] He thus concluded that Plaintiff had only "mild" limitations in social functioning. [R. at 15.]

Plaintiff claims the ALJ gave too much weight to the evidence supporting a finding that the impairments were not severe. [Dkt. 15 at 15-16.] He notes that Plaintiff was involved in a verbal altercation even after stating that medication alleviated his belligerence, and he argues that Plaintiff's relationships were not as stable as the ALJ implied. [Dkt. 15 at 16.]

The Court acknowledges that some of the evidence in the record—such as Plaintiff's apparent propensity for verbal altercations—conceivably could have "more than a minimal effect" on Plaintiff's ability to work. SSR 85-28. This Court, however, may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman*, 546 F.3d at 462. As long as substantial evidence supports the ALJ's decision, it will be upheld, *Dixon*, 270 F.3d at 1176, and here, the ALJ provided such evidence: he specifically cited and described numerous parts of the record that supported his finding that Plaintiff's social functioning did not render his mental impairments severe. [R. at 15-16.]

Plaintiff is correct that the ALJ did not cite every piece of conflicting evidence, [Dkt. 15 at 16; R. at 15-16], but the ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson*, 999 F.2d at 181. Instead, he need only provide a "glimpse into [his] reasoning" and "build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176. Here, the ALJ noted that medication improved Plaintiff's social

functioning and explained that Plaintiff could maintain relationships with neighbors and family members. [R. at 15-16.] The Court can thus follow the ALJ's reasoning from the evidence to his conclusion and will therefore uphold the ALJ's decision.[4]

Plaintiff further argues that the ALJ "play[ed] doctor" in concluding that Plaintiff's limitations on social functioning were "mild." [Dkt. 15 at 17.] He claims the ALJ substituted his "lay judgment for that of an expert," and should have relied more strictly on medical evidence in assessing Plaintiff's social functioning. [Dkt. 15 at 17.]

This argument is unavailing for two reasons. First, the ALJ *did* cite medical evidence supporting his conclusion. He extensively discussed Plaintiff's consultative examination with Dr. Hoye, [R. at 14-16], including those portions that indicated Plaintiff had a stable mood; reacted appropriately to the situation; and was generally cooperative. [R. at 14, 383.] The ALJ thus provided medical evidence supporting his conclusion that Plaintiff could function in a social setting. Further, the ALJ cited the opinions of the state agency reviewing experts, [R. at 16], both of whom reported that Plaintiff did not have a severe mental impairment. [R. at 419, 476.] These experts, in fact, indicated Plaintiff had *no* difficulties maintaining social functioning, [R. at 429], such that the ALJ's conclusion that Plaintiff suffered from "mild" limitations, [R. at 16], was, if anything, *more* restrictive than the medical opinions he cited.

Second, an ALJ "play[s] doctor" when he "fail[s] to address relevant evidence." *Dixon*, 270 F.3d at 1177. In this case, however, the ALJ specifically acknowledged the portions of Plaintiff's medical records indicating social limitations. [R. at 15.] The ALJ did not "fail to address" this evidence; instead, he simply found that other portions of the record "substantially

---

[4] This result is required even if the Court would have weighed the conflicting evidence differently. *See, e.g., Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) ("[T]he evidence of record would allow reasonable minds to differ as to the severity of [Plaintiff's] impairment, requiring deference to the ALJ's conclusion.").

outweighed" this evidence. [*Id.*] The ALJ thus complied with the requirement that he address the entire record and did not "play doctor" in the way Plaintiff alleges. The Court therefore finds that substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were not severe.

### 2. Consideration of Non-Severe Impairments

Plaintiff next argues that, even if his mental impairments were not severe, the ALJ should have more extensively considered them when constructing Plaintiff's RFC. [Dkt. 15 at 17.] He notes that "the recitation of the RFC" contains "no consideration" of the mental impairments whatsoever, and accordingly contends that it was erroneous for the ALJ to conclude that Plaintiff could perform jobs requiring him to interact with the public. [*Id.*]

Plaintiff is correct that when "assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p. This is because such impairments, in combination with a claimant's other conditions, may "prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When constructing the RFC in this case, the ALJ extensively discussed Plaintiff's physical impairments, including his elbow injury [R. at 18-20, 22], back pain [R. at 20], degenerative disc disease [R. at 20-21], and headaches. [R. at 21-23.] At no point, however, did the ALJ discuss the impact of Plaintiff's mental impairments on his RFC. [R. at 18-23.] Thus, the ALJ erred by failing to comply with SSR 96-8p.

Additionally, the fact that the ALJ discussed Plaintiff's mental impairments during his earlier step two analysis does not save the ALJ's RFC assessment. The process "used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process" is "not an

RFC assessment." SSR 96-8p; *see also Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13

(N.D. Ill. Jan. 17, 2012) ("[L]imitations determined at Step 2 under the special technique are not

a substitute for a RFC finding.").  Instead, the "mental RFC assessment used at steps 4 and 5 of

the sequential evaluation process requires" an ALJ to provide "a more detailed assessment by

itemizing various functions contained in the broad categories found in paragraphs B and C of the

adult mental disorders listings in 12.00 of the Listing of Impairments." SSR 96-8p. By neglecting

to include *any* discussion of Plaintiff's mental impairments in the RFC analysis, the ALJ in this

case plainly did not provide "a more detailed" analysis of these impairments than he did at step

2, such that he failed to comply with SSR 96-8p.

     The Court cannot excuse this failure under the doctrine of harmless error. An error is

harmless when "it is predictable with great confidence that the agency will reinstate its decision

on remand because the decision is overwhelmingly supported by the record." *Spiva v. Astrue*,

628 F.3d 346, 353 (7th Cir. 2010). As noted above, however, numerous parts of the record in this

case support a finding that Plaintiff's mental impairments and, in particular, his limitations on

social functioning, could limit his ability to work. [*See, e.g.*, R. at 287 (noting history of

altercations and "difficulty checking impulses to strike out"); R. at 408 (describing a verbal

altercation and noting history of "rage"); R. at 409 (reporting Plaintiff's desire to fight to release

his energy).] It is therefore plausible that, in combination with his physical restrictions,

Plaintiff's social limitations could prevent him from engaging in substantial gainful activity.[5]

The Court thus lacks "great confidence" that the ALJ would have reached the same decision if he

had properly analyzed Plaintiff's RFC, and the Court must remand this case.

---

[5] This is especially true because the vocational expert stated Plaintiff would be able to perform jobs such as arcade attendant, information clerk, and officer helper, each of which would regularly require Plaintiff to interact with coworkers and/or members of the public. [*See* R. at 26.]

On remand, the ALJ should reassess Plaintiff's RFC and should specifically discuss how Plaintiff's mild limitations in the paragraph B and C functional areas—and especially those limitations on social functioning—affect Plaintiff's ability engage in substantial gainful activity. *See, e.g.*, *Verlee v. Astrue*, No. 1:12-CV-45-TLS-RBC, 2013 WL 1760810, at *9 (N.D. Ind. Apr. 24, 2013) (remanding for explicit discussion of the impact of limitations in each functional area).

## B. Headaches and Listing 11.03

Plaintiff next argues that the ALJ did not adequately address Plaintiff's migraine headaches under Listing 11.03 for "nonconvulsive epilepsy."[6] [Dkt. 15 at 19.] He contends that "no medical advisor designated by the Commissioner . . .  expressed an opinion as to whether [Plaintiff's] impairments equaled a listing," and that the ALJ should have therefore obtained an updated medical opinion before deciding the issue of medical equivalency. [*Id.* at 23-24.] He also contends that the records the ALJ cited in his decision do not support the ALJ's conclusion that the headaches did not meet or equal Listing 11.03. [*Id.* at 19.]

Step three of the disability analysis requires the Commissioner to determine whether the claimant's impairment or combination of impairments meets or medically equals any impairment in the Listing of Impairments. "[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p.

In this case, two state agency physicians completed Disability Determination and Transmittal Forms indicating that Plaintiff was not disabled, and two other state agency

---

[6] Although the Listing of Impairments does not contain a specific reference for headaches or migraines, ALJs frequently consider whether these impairments satisfy the criteria for Listing 11.03. *See Keller v. Colvin*, No. 1:13-CV-00104-TWP, 2014 WL 948889, at *5 (S.D. Ind. Mar. 10, 2014).

physicians affirmed these opinions. [R. at 59-62.] "These forms conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.'" *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (quoting *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir.1989)). Thus, contrary to Plaintiff's assertion, properly designated medical experts did review the record and did provide an opinion on medical equivalence.

Next, Plaintiff's contention that the ALJ should have obtained an updated medical opinion is unavailing. Plaintiff cites SSR 96-6p, which provides that an ALJ "must obtain an updated medical opinion from a medical expert" when "additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p.

The forms containing the state agency physicians' opinions in this case were completed in August 2011 and affirmed in November 2011. [R. at 59-62.] Plaintiff's medical records pre-dating these opinions contained extensive evidence of his headaches and his response to various medications. [*See, e.g.*, R. at 336, 347, 442, 479.] Also, state agency reviewing physician Dr. Joseph Gaddy specifically noted Plaintiff's history of headaches and his positive response to Topamax. [R. at 460.] The medical opinions on equivalence therefore included a consideration of Plaintiff's headaches, making it unnecessary to obtain an updated opinion to consider this evidence.

The Court acknowledges that records post-dating the state agency equivalence determinations also contained evidence of headaches. [*See, e.g.*, R. at 512.] At step three, however, Plaintiff bears the burden of proof, *see, e.g., Young v. Barnhart*, 362 F.3d 995, 1000

(7th Cir. 2004), and Plaintiff in this case has not explained how this later-received evidence "may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent." SSR 96-6p. Indeed, Plaintiff argues that "no medical advisor designated by the Commissioner" expressed an opinion on equivalence *at all*, [Dkt. 15 at 23], making it difficult to simultaneously argue that the later-received evidence would have *changed* that opinion. In any event, the Court also notes that much of the later-received evidence of headaches is similar to the evidence that was before the state agency experts. [*Compare, e.g.*, R. at 353 (complaints of "constant" headaches), *with* R. at 512 (complaints of headaches "every day").] Thus, it seems unlikely that the evidence would have changed the state agency physicians' opinions, making an updated opinion unnecessary. *See* SSR 96-6p.

The only remaining issue in the step three analysis is whether the ALJ properly explained his finding that Plaintiff's headaches were not equivalent to a listing. Plaintiff contends that the ALJ did not do so because the portions of the record the ALJ cited when considering Listing 11.03 included conflicting statements indicating both 1) that Plaintiff's headaches responded well to treatment and 2) that Plaintiff nonetheless "continue[d] to have daily headaches" and "intermittent migraines." [Dkt. 15 at 19.]

As noted above, the job of this Court is not to reweigh the evidence. *Overman*, 546 F.3d at 462. The ALJ, however, "may not ignore an entire line of evidence that is contrary" to his decision. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

The ALJ in this case ignored such evidence: His conclusion that Plaintiff's headaches did not meet or medically equal a listing is based only on a finding that "the claimant's migraines responded well to a variety of medications, including Triptan, Topamax, and Imitrex." [R. at 17.]

This statement has support in the record, but it ignores the contrary evidence contained in the same portions of the record the ALJ cites to support this proposition.

The ALJ first cites a visit to the Wishard emergency department that indicates that Imitrex controlled Plaintiff's headache "very well for several hours." [R. at 336.] That visit, however, also indicates that Imitrex then "stopped" working; that Plaintiff had multiple severe migraines each week; and that Plaintiff's doctors likely could "not make him headache free." [*Id.*] The ALJ then cites a second Wishard visit indicating that Triptan relieved Plaintiff's headaches. [R. at 347.] The record of that visit, however, also states that Plaintiff had a "limited number of [Triptan] pills" and that he "runs out quite frequently." [R. at 347.] Finally, the ALJ cites a third Wishard record. Like the first record, this one states that Imitrex helped relieve Plaintiff's headaches, [R. at 443], but it adds that Plaintiff will "not take the Imitrex until his blood pressure is under control." [R. at 443.]

Together, these records establish that Plaintiff's headaches were not as well controlled as the ALJ implies. Medication may have helped relieve Plaintiff's symptoms, but Plaintiff apparently lacked enough medication to use it as desired, [R. at 347], or could not use the medication because of his other impairments. [R. at 443.] Moreover, even when using the medication, he was not "headache free." [R. at 336.]

The ALJ offered no explanation for discounting this evidence, [*see* R. at 17], and his apparent decision to ignore it makes it "impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence."[7] *Golembiewski*, 322 F.3d at 917. The Court

---

[7] The Commissioner argues that the "agency reviewing physicians' opinions constituted substantial evidence supporting the ALJ's Step Three finding as to medical equivalence." [Dkt. 16 at 18.] The Commissioner is correct that such opinions can provide substantial evidence that an impairment is not equivalent to a listing. *See, e.g.*, *Scheck*, 357 F.3d at 700. The ALJ, however, did not cite the state agency physicians' opinions in his step three analysis. Instead, he cited only the portions of the record described above. [R. at 17.] The Court therefore cannot determine whether the ALJ considered these opinions; if he did, then on remand he should explain his decision to grant these opinions more weight than the above-identified conflicting evidence in the record. *See, e.g.*, *Rabe v.*

must therefore remand the case to the Commissioner. *See id.* On remand, the ALJ should explain how his decision accounts for the conflicting evidence in the record.[8]

## C. Consideration of Excusals from Work

Plaintiff finally contends that the ALJ erred by not discussing "the fact that [Plaintiff] was medically excused from work for an entire year due to his right elbow problems." [Dkt. 15 at 26.] Plaintiff's argument refers to the numerous excusals from work that Dr. John Garber signed during treatment of Plaintiff's elbow injury. [*See, e.g.*, R. at 308, 310, 322.] Plaintiff claims that the ALJ violated SSR 96-8p because he "erroneously ignored" these excusals. [Dkt. 15 at 27.]

The portion of the Social Security Ruling that Plaintiff cites provides that an ALJ's RFC analysis must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p. The ALJ in this case complied with this requirement. The ALJ discussed at length the symptoms associated with Plaintiff's elbow injury and the effect of his injury on his ability to perform work. [R. at 18-20.] Moreover, the ALJ imposed more restrictive limitations on Plaintiff's ability to lift and carry objects in a work setting than did Dr. Garber. [R. at 22.]

---

*Astrue*, No. 1:10-CV-0860-WTL-TAB, 2011 WL 2899063, at *4 (S.D. Ind. July 15, 2011) (remanding for equivalence determination where "ALJ's short discussion of the listed impairments" did not "reference the Forms completed by the state agency doctors").

[8] The ALJ on remand may also wish to consider consulting a medical advisor. As noted above, this case did not involve the receipt of "additional medical evidence" that could have changed the state agency physicians' opinions of non-equivalence. Thus, SSR 96-6p does not require summoning a medical expert for this reason. *See* SSR 96-6p. That Social Security Ruling, however, also requires an ALJ to obtain an updated medical opinion if "in the opinion of the [ALJ] the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable." *Id.* In this case, consideration of the conflicting evidence identified above may make a finding of equivalence more "reasonable," and hence may make an updated opinion appropriate. An ALJ, however, has broad discretion in deciding whether to request an additional medical opinion, *see, e.g., Cole v. Colvin*, No. 1:13-CV-01368-SEB-TAB, 2014 WL 4415998, at *5 (S.D. Ind. Sept. 8, 2014), such that an updated opinion in this case is not necessarily required.

Furthermore, the fact that Dr. Garber excused Plaintiff from work is largely irrelevant. As Defendant notes, the issue in this case is whether Plaintiff is disabled—that is, whether Plaintiff can engage in substantial gainful activity. [Dkt. 16 at 21 (citing SSR 82-52).] The issue is *not* whether Plaintiff is able to perform the particular job as a mechanic that he happened to have at the time Dr. Garber determined that his injury prevented him from performing that job.

In reply, Plaintiff contends that it is improper to "assume" that Dr. Garber's excusals were meant to apply only to Plaintiff's work as a mechanic. [Dkt. 18 at 2-3.] He notes that none of Dr. Garber's work releases "specify that [Plaintiff] cannot return to work as a mechanic," and that they instead "simply state that he is either released from work or may not return to work." [*Id.* at 2.]

The Court disagrees with this argument. As the ALJ noted in his opinion, Plaintiff "interviewed for other jobs" even during the time period when Dr. Garber had signed releases from work duty. [R. at 19.] Plaintiff contends that "all this proves is that [Plaintiff] wanted to be an active member of the workforce," [Dkt. 15 at 26], but it seems more likely that if Dr. Garber *had* excused Plaintiff from all work, then Plaintiff would not have sought such other work. Also, when releasing Plaintiff from his care, Dr. Garber wrote that "I do not feel that [Plaintiff] will be able to ever return to his previous occupation *as an automobile mechanic*." [R. at 331 (emphasis added)], supporting the conclusion that Dr. Garber's previous work releases were also limited to Plaintiff's occupation as a mechanic.

Additionally, even if Dr. Garber's releases *did* extend beyond work as a mechanic, a claimant "is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Instead, "the Commissioner is charged with determining the ultimate issue of disability." *Id.* Dr. Garber's

statements in this case therefore do not establish that Plaintiff suffered from a disability. The ALJ must of course consider statements from treating sources, *see, e.g.*, 20 C.F.R. § 404.1527(c), but as described above, the ALJ in this case extensively discussed Plaintiff's treatment under Dr. Garber. [R. at 18-20.] As such, the ALJ did not err in failing to specifically discuss or grant more weight to Dr. Garber's excusals from work. Remand remains necessary for the reasons previously described, but on remand, the ALJ need not reconsider the impact of Dr. Garber's excusals from work.

## Conclusion

For the foregoing reasons, the Court finds that substantial evidence does not support the ALJ's determination that McGill was not disabled and the Magistrate Judge recommends that the Commissioner's decision be **REVERSED** and **REMANDED**. On remand, the ALJ should specifically discuss Plaintiff's non-severe mental impairments in constructing Plaintiff's RFC and should more fully explain his finding that Plaintiff's headaches did not meet or medically equal Listing 11.03. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 12/01/2014

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana